Mr. Chief Justice, and may it please the Court, Section 365 of the Bankruptcy Code lets the trustee decide whether the estate will become a party to an executory contract of the debtor. If so, the trustee assumes the contract, and the estate steps into the debtor's shoes. If so, the trustee assumes the debtor's shoes. If not, the trustee rejects the contract. The statute's plain text tells us what that means. Rejection constitutes a breach of such contract immediately before the date of the filing of the petition. The debtor will not fulfill any remaining unperformed obligations under the contract, and the counterparty will have a pre-petition claim against the debtor for any resulting damages. But that's all rejection is, the estate's decision not to take on the debtor's future performance obligations, which are therefore breached. The overwhelming consensus of courts and scholars is that rejection can't give the estate any greater rights with respect to the rejected contract than the debtor would have outside bankruptcy. And as Respondent doesn't contest, outside bankruptcy, a licensor could not use its own breach of contract as a basis to terminate the licensee's rights under the agreement. Alito, you just said, and I think it's correct, that the debtor would be – rejection means that the debtor has no obligation to perform future duties under the contract. But if the debtor in this case, as the owner of the trademark in question, did not continue to perform quality control activities in relationship to the mark, would that not imperil the future of – the validity of the mark? So how can – how can the debtor not continue to perform duties under the contract? So the – the quality control obligation is an obligation that's imposed by trademark law, not solely by the contract, and in many cases not at all by the contract. It is quite true that if – Sotomayor, how is that relevant? Meaning, yes, I assume that there's both a contractual obligation and a legal obligation under trademark law, but to the extent that there's a rejection of the contract, the property owner is electing to say, as he – as it is entitled to say under the law, I reject that obligation vis-à-vis you. Hence, you can't continue to use my mark, because I can't assure I'm not capable – that's why you reject a contract, because it's not beneficial to the company – I reject that obligation, hence I reject your being able to use it. With respect, Justice Sotomayor, that is not how it works. Why? When – Why? How – why isn't that exactly how it works? Meaning, once I lend you something and say it's conditioned of my approval of what you're doing, and I withdraw that approval, haven't I withdrawn? No. So the license – so let's imagine that the agreement itself imposed an obligation on the licensor to monitor the quality of the licensee's goods. If that is so, the One of the trademark amici briefs said, if you're the licensee, you don't have the right to produce an item. If this license was one in which I gave you the license to sell my goods, that they – and I refuse to sell you the goods, they can't go out and make the goods. They can't go out and put the trademark on something else because they don't have the right to do that. Different license agreements work in different ways. I don't disagree, but the point is that you've been – that by rejecting the contract, I've basically said you can't use my goods. You're entitled to sue me. You can't use my mark. You're entitled to sue me. Justice Sotomayor, let me explain why I think that's not correct. First of all, outside bankruptcy, as Respondent has conceded, the licensor's breach would not let it take away the licensee's right to use the mark. The licensor could say I'm breaching all day long, but the licensee could continue to use the mark. When you say that, Ms. Spinelli, what law do you look to to find that – to find that principle? I mean, you say you look to outside bankruptcy law. Correct. Correct. Are you looking to State law? Is it a kind of common law? Trademarks are governed by State law, by Federal – and by Federal statute, the Lanham Act and the case law that's developed under the Lanham Act. So – but this is actually a much simpler principle. It's simply that there – there is nothing that the licensor could do outside bankruptcy by breaching to stop the licensee from using the mark. The only thing that it could do is bring a suit to enjoin the licensee from using the mark, and in that case, the license would be a complete defense. So outside bankruptcy, it can't be done. The other point – Sotomayor, I do have a question about – Of course. 365N. Of course. Which is, 365N is not the default rule with respect to intellectual property. It gives more and less rights to the lessors and lessees than the common law would permit. That's correct. It seems counterintuitive to me, or counter-logical given the explanation that the Congress gave, that it understood the trademark owners would get more rights than N provides to other licensors in the intellectual property field. It mentioned the reason why the courts up to that time who had recognized rejection as termination, that trademark owners were different because they had quality control problems. So I read that and I think to myself, why would you think of giving trademark owners more rights or less rights than people under N? Let me explain, Justice Sotomayor. It is certainly true that Congress made an advertent decision to leave trademarks out of 365N, but the legislative history makes it very clear that in enacting 365N, Congress did so because it thought the rule of Lubrizol, which is that rejection deprives the counterparty of rights already conveyed under the agreement, was wrong. And that principle can't logically be confined. But it didn't think it was wrong completely, because it did a sort of hybrid giving more and less at the same time. But it did completely repudiate the Lubrizol rule. Not really. It kept some of it and it rejected others because of the situational difference. Now, with respect, Justice Sotomayor, what it did is it said that the licensee can retain its rights under the contract, and that's precisely the issue in Lubrizol. It did, in addition, go on to set out a specific Federal regime governing subsidiary issues that arise with respect to the relationship between the licensee and the licensor following rejection. And you're correct that that regime differs in some respects from the State law that would otherwise apply. But there is no question whatsoever that Congress repudiated the basic rule of Lubrizol, saying that it was never intended that, in addition to relieving itself of the debtor's affirmative performance obligations, Congress never thought that rejection would enable the estate to take back rights already conveyed to the licensee. Ginsburg. One could say it didn't take any position on Lubrizol one way or another in the trademark context. It did, quite specifically, in the patent context. But it didn't either approve or disapprove. One could say that, Justice Ginsburg. I believe the reason that Congress didn't include trademarks in 365N is because it, first of all, it was dealing with an emergency with respect to patent licenses. The situation was described as urgent. That was what Lubrizol was about. Congress recognized that trademarks do have some differences from patents, and it thought that further study was required in order to shape the Federal rules that would govern the parties' relationship. Kagan. And again, the difference, it said specifically, didn't it, what the difference it thought there was, right? Yes it did. Which was this quality control obligation that Justice Alito started us off with. And I guess just to take us back there, why is it that that obligation does not make trademarks different under, you say we look to state law. I mean, is it, are you saying that there's uniform state law that says that the quality control obligation sort of makes no difference with respect to this issue, that the entire contract is not unwound? There's, I don't believe anyone would say that the entire contract can be unwound by the unilateral act of the licensor. That's just basic contract law. Right. I mean, the question is whether the quality control obligation makes trademarks different from normal contract law. No. That's the question. And the answer is no. There is no support for that at all. What happens, what happens when the licensor abdicates its quality control obligations, which again stem from trademark law, not from the contract, is that the licensor risks abandonment of the mark. So the licensor may use the, may lose its rights in the mark. If that happens, then the mark is up for grabs. The licensee can continue to use it, so can third parties. Whoever can establish rights in it through use will be the new owner. But it absolutely does not change basic contract law principles, including that the breaching party cannot terminate the contract because it breaches. The opposite is true. I'm sorry, Justice Alito. What would happen in this situation? The debtor is the lessor of residential property. It rejects the lease. And you would say that the, however, the lessee could continue to live in a residential property and the lessor would be relieved of any further obligations under the contract? Correct. But not statutory obligations? Correct. So if there was a statute that said that any lessor of residential property has to provide heat, it would continue, it would have to continue to do that? Precisely. And the reason that's so is that the estate is the owner of the underlying property. So if it's an apartment building, the estate now owns the apartment building. The estate is not given any kind of exemption from generally applicable law relating to property ownership simply because it's in bankruptcy or because a contract relating to that asset has been rejected. This is the kind of thing the trustee deals with every day. The trustee is obligated with respect to all of the estate's assets to comply with generally applicable law. And it's also required to decide whether a particular asset is valuable enough to be worth investing estate funds in. So with regard to the quality control obligation, the trustee will have to make a decision, is this mark valuable to the estate? And if so, is it valuable enough to warrant making the really pretty minimal investment that's necessary to continue monitoring quality? I mean, just thinking – I'm sorry. No, please, Justice Kagan. Just thinking about that example you gave, the analogy of the lessor of real property, there is in many cities background law that says once the landlord stops maintaining the property, the city insists that the tenant leave because the property isn't safe anymore. And I guess one question is whether there might be or is a similar background rule with respect to what happens to a trademark where the obligation for quality control is not being maintained. Is that a silly analogy? It's not a silly analogy at all, but there is not analogous law. You know, again, the licensor's breach doesn't entitle it to terminate the licensee's rights. Does the licensee have any rights with respect to quality control if the licensor is not fulfilling its duty? So the licensee frequently takes upon itself the great burden of quality control. I mean, quality control is obviously in the licensee's interest as much as the licensor's because the licensee wants to maintain the validity of the mark just as much as the licensor, and the licensee is selling goods and it doesn't want them to get a reputation for poor quality. Can I ask you to address the mootness question in this case? Of course. So as I understand it, let's put the exclusive distribution rights off the table. The corporal owes said they're forfeited. Assume for the moment that I'm going to – I'm not going to un-forfeit them. So we just have the license arrangement. And as I understand it, your client wasn't under any orders not to use the license of the trademark. And so what theory are you injured and what damages might you have?  So this is the case that the bankruptcy court decided to place a trademark on its goods post rejection. The bankruptcy court – But wait a minute. It had stopped – it had said two years before, leading up to the agreement, that it wasn't going to order any goods. Well, what happened, Justice Sotomayor, is that prior to bankruptcy, Technology attempted to terminate the contract. Mission placed a purchase order. Technology said, we're not going to fill that order. So it's true that immediately before the bankruptcy, Mission hadn't been placing purchase orders because Technology was refusing to fill them. And then once the rejection order was put in place – Were you producing your own goods using their trademark, or were you just buying from them? No. Oh, I'm sorry. No. At that point, we were purchasing the goods from Technology, which was a requirement under the contract. So they no longer had to supply you with goods. So why are we here? Meaning, that's a brief. They have an obligation, and you're open to damages. But without you producing the goods, I thought that brief from the MIAC guy said that you're relieved from supplying goods. The lessor is relieved from supplying goods. But, Justice Sotomayor, we had a right under the agreement, if Technology failed to provide us with goods, to source those goods elsewhere. May I reserve the remainder of my time? Yes. Thank you. Mr. Tripp? Excuse me. Mr. Chief Justice, and may it please the Court, if I could just pick up on a couple of the questions about whether trademarks are different, and then say a few words about our rule, why respondents are wrong, and what the United States' interest is here. So I think an important point about trademarks, what the quality can involve— I'm not going to interrupt you again. But if you could add to that excellent list of things to do, discussing mootness. Thank you. I'll start with the mootness. The case is not moot. This is, at bottom, a claim for money damages, and it's still up in the air whether Petitioner is going to get a judgment in its favor. Respondent has raised a number of arguments why, on remand, Petitioner would lose, even if you rule in their favor here. But Petitioner disputes all of that, and no court has resolved those remaining disputes. Well, if we put aside the exclusive distribution agreement, and I really don't want to belabor this, but I'd like you to focus specifically on the trademark license. If there was no order prohibiting Petitioner from using the trademark at any point, then where are the damages? This part of Respondent's argument, I'm not sure I understand, because it seems to prove way too much. Because if it's right that you can't get damages, even when there's a bankruptcy court order, basically a declaratory judgment saying that it would be unlawful for you to use the mark, then you wouldn't be able to get damages, even under their theory of the case, that you can take away the license in bankruptcy by rejecting it and terminating it. You would leave the counterparty with nothing unless they went back into court and said, no, that's the thing, the court just told it was already illegal. It's a very strange argument, so I'm not sure I follow that. Well, I'm not sure I follow you, so one of us is just confused, and it may well be me. But if the bankruptcy court is simply saying you've rejected it, and if rejection only means that you don't have to perform and that you've breached, does that prohibit Oh, no, that wouldn't have prohibited it, but what the bankruptcy court here went further and said, the effect of rejection is to terminate your license, is to take it away from you. It adopted Respondent's rule, which were respectfully submitted as wrong. Okay. I track you down. So Petitioner is saying there's money on the table. Go back to the argument you were making. So the court tells them you can't, you don't have an exclusive license. That's been waived or forfeited. So what remains of this case? Because you're saying under their theory, they can't move forward. They have a non-exclusive license, but if they're not getting goods, what's their reason for not moving forward? Why isn't this case moved? Well, at least as I understand Petitioner's theory, and of course, we wouldn't have a position on what's going to happen on remand. They are saying there is still money on the table. They could have gotten, they could have sourced the goods from somewhere else, and no court has resolved these remaining claims. And so this is still very much a live case, and we're really urging the Court just to answer the trademark question here and to send it back down. The First Circuit has a damaging precedent on the books that we think really just a situation where you're a franchisee who's invested millions of dollars in reliance on the ability, you know, to put up the name McDonald's and the Golden Arches and all of that. Under Respondent's rule, what they're saying is as soon as the trademark owner goes into bankruptcy for any reason, they can pull the rug out from under every single one of its franchisees and basically put them to an extortionate choice between paying a higher royalty payment or shutting down their business and firing all their  members. And so we're really urging the Court just to adopt the Sunbeam rule and to reverse it. And to get back. Breyer. Do you want to? Are you going to? I mean, the main question that I have, I think, is the same that Justice Alito and Justice Kagan have. Yeah, that's what I was just saying. Well, where I think, well, let me show you. Where I think this comes from is an article by Professor Andrews, and he says, look, I'm a debtor. You're the licensee, but say you leased a house. There are two assets here. One is the house, which you leased, and the other is a promise by me to replace the windows. All right? So if you can analogize it to that, you win. Well, the more I think about it, I'm not sure. Why? A, there are a lot of special provisions in the trademark law and in bankruptcy law about houses and leases. B, it's really a special kind of house. It's like a house that will collapse unless you keep it up. Maybe like an igloo that you promised to air condition. You know, you break your promise to air condition, no more igloo. Now, if you seem to think of it like that, you think, no, there aren't two rights. Yeah. This upkeep business is an essential part of one right, which is going to give you the house to live in. So I would like you or Ms. Spinelli or, you know, at some point to tell me which is the strong, why is it the stronger one? Yeah, it's not really like that. And I think a key portion of this, key piece of it is if the trademark owner stops performing the quality control and maintaining the distinctiveness of the mark to consumers, that does not instantly destroy the mark, right? That is a process. It's gradual. It's over time. And then another thing that makes it different from your igloo example is that at the end of the day, the licensee can still use the mark. Because the only thing that happens if you stop performing the quality control is eventually at the end of the day, after some period of time, it'll be abandoned and returned to the public domain. And I really think it's actually, it's a lot more like the situation in our brief, which we talk about, of leasing somebody a photocopier where you agree to maintain it over time. It may well be that if you stop the maintenance on the photocopier, that eventually the photocopier is going to eventually break down. But that doesn't mean that you can repossess the copier by breaching your obligation to perform the maintenance, right? That's, I think, really the heart of this case. Just to say a couple words about why respondents are wrong. They're pressing an argument in their briefs that you should draw a negative inference from N, that the exact opposite rule should apply for trademarks. I just want to emphasize how bizarre it would be to read N that way. The whole point of N was to overrule Lubrizol's specific result as to patents. And nobody implicitly ratifies or endorses a court's mode of reasoning. Sotomayor. Except the report said exactly the opposite, that they weren't taking a position. Yeah. So it can't be that their entire purpose was to overrule. As I mentioned, they overruled it in part and didn't in part. Because for certain contracts, they gave the lessees more rights or the lessors more rights. They exempted some things from royalty payments or royalty setoffs. They did a bunch of different things. So I think that's, I think really they overwhelmingly overruled Lubrizol. That's really the bottom line. And the differences are really far down in the details. This is a reticulated scheme that Congress established for patents that is, I admit, somewhat different than what would apply under the general background rule. Like under N-3 and N-4, this is pretty far down in the weeds, but this is reproduced in our brief in 14a and 15a. It imposes basically an obligation on the licensor to actually continue performing some of the obligations under the contract, notwithstanding the rejection. In N-4, it imposes a duty to continue performing even during the period where the trustee is still trying to figure out whether to assume or reject it. And so I think really the right lesson to take away from N is the one Justice Ginsburg was saying, which is that it doesn't put a thumb on the scale one way or the other. They just didn't answer the trademark question. Sometimes an omission is just an omission, as Judge Easterbrook put it. But so then what you have to do is just resolve this by looking at the background rule under A and G, and on that I think we have just by far the better of the reading because G tells you what happens when you reject a contract, and the answer is that the rejection constitutes a breach. And I guess just one last point about G, which I think is very helpful to our position here, and this is reproduced in the text at 8A. I mean, really Respondents are effectively reading N to be an exception to the general rule in G. They are saying that the general rule in G is that you can claw back somebody's rights, take back past performance. But if you look at the text of G, it just doesn't say that. It doesn't mention N. It doesn't say that it's an exception. And it identifies these two other provisions, H-2 and I-2, as exceptions to the general rule, and they have nothing to do with what we're talking about here. Those are about situations where you get an offset rather than a competition  Sotomayor, I'm sorry. I don't really understand that argument. It seems as all of these are exceptions by their nature, and that goes contrary to the general rule, that if it's an exception, the rule is different than the exception. No. I think what they really are are codifications of the background rule to clarify difficult situations that have arisen. Sotomayor, I think, but, you know, the greatest problem here is that rejection is not a contract term. We don't – when we talk about contracts, we talk about repudiating them, terminating them, avoiding them, a bunch of different language. But bankruptcy is using a very specialized term, rejection. And your adversary is right that it's not generally that we reject a piece of a contract. We generally reject the entire contract. And so it's not the rejection of one claim under the contract. So there is some force to their argument that reading it the way you do is contrary to its language. If I could answer the question. Yes. So just, I mean, G says that it constitutes a breach. I've already walked through a couple other things. The avoidance power is cut back on this. But just one last one is the history of this language, which we discuss in our brief, that it's grounded in the common law of trusts and receiverships, the idea that the trustee is not technically a party to the contract, and it has a choice of whether to assume or reject it. And the rule back then under the common law was the same one we're advocating now. The learned hand decision we cite in our brief drives us home that the bankrupt landlord, the trustee, can stop paying for your heat and hot water, but he cannot evict you. You keep your rights. And so we're asking the Court to reverse. Roberts. Thank you, Mr. Tripp. Mr. Hallward-Driemeier. Mr. Chief Justice, and may it please the Court. I'd like to start with the issue of mootness. And if we take the exclusive distribution rights off the table, which was the source of the $4 million of claims that Petitioner referred to in their reply at the petition stage that kept the case from being moot, we're left only with a non-exclusive trademark license that is already expired. And any dispute about the rights under that is moot. As I said, it's already expired, so we don't have a forward-looking issue. It would only be a past issue. And as the questions have indicated, there was no use of the trademark during the post-rejection period. The bankruptcy court did not stop that non-exclusive use, correct? That's right. All that the bankruptcy court did was, at our request, declare the party's rights. What was the meaning of rejection? And the only argument that Petitioner has, that they have some basis of claim against my client for the post-rejection period, is that we sought that ruling from the Court. Why is that enough to at least have an acorn of injury for Article III purposes? The uncertainty created by a declaratory judgment that effectively you can't use it may not prohibit you from using it, but it sure may cause you to think twice about doing so, and there might be damages available. Your Honor, I think that would be directly contrary to the First Amendment and the Knorr-Pennington doctrine. We have a right to go to court to ask it to declare the party's rights, and that can't be the tortious act that creates damages on part of the other side. They have no claim against us because we took no action against them to stop them from using the trademark. Their own words in the First Circuit reflect this, because by their own words, and this is at JA 572, they say, But for the bankruptcy court decision, Mission would have continued using Cool Corps' trademarks. So it was only that decision, and our only act is asking the Court to make a ruling, and I don't believe that this Court's precedent would allow a claim to be based on that. That's our mootness argument, and with that I'm happy to proceed to the merits on the assumption that the Court might reach them. Sotomayor, could you answer the Solicitor General's concern that a ruling in your favor would affect any number of other contracts, the copier example, the car example, any of the other or the McDonald's franchise? I'd be happy to, Your Honor, because I think the photocopier example is actually paradigmatic. And there is we mentioned that there is another section of the code, section 542a, that provides for a party who is in possession of property of the estate to return that property to the estate upon the filing of the petition. And if the copier is held under a lease, then the copier is property of the estate, and that provision would require the party to return the copier to the bankruptcy estate unless they assume the contract, which they're going to do because that's a source of income. So as a practical matter, they always assume that. The copier in position under the contract is worth more than getting back a used copier, which is not worth very much. But that's what the rule provides. If, on the other hand, the copier has already been sold, then it's no longer property of the estate, and the other party does not have to return it. And that's exactly what the rule that we advocate for. So under section 352a. Sotomayor, and the McDonald's franchise? The McDonald's franchise is an interesting exception because they highlight the million dollars perhaps or more that's been invested by the franchisee. That does not distinguish the franchisee from any of the other creditors of the bankruptcy estate. A person might have invested millions of dollars as a bondholder in the estate. It might have been a trade creditor with millions of dollars of claims. All of those claims are reduced to often pennies on the dollars because they're prepetition claims. And that's the same that Congress provided for counterparties. All the creditors of the bankruptcy estate have to bring these claims as prepetition claims. And that's the critical language of 365g1. It says that it constitutes a breach, but it doesn't stop there. It says that it constitutes a breach as of the day before the petition. It's a prepetition claim for breach. And it's the temporal element that's critical. And that temporal element continues through the other provisions. 502g1 says that you must bring your claims on the basis of rejection and that that claim is as if the breach had happened before the petition. And when you get to 1114, which is the discharge provision, it says that those claims that arose before the plan is confirmed are discharged. And then it specifically cross-references 502. Alito, what do you say about the example of the lessor and the lessee? Well, Your Honor, ever since the 1934 Act, Congress has included exceptions that specifically deal with real estate. And so I would say we'd have to go to the terms of the specific exception in 365h1. Now, what's notable is that that exception, two things. One, it provides less rights, not more, but less rights than under Petitioner's general rule. So instead of being an exception that protects a favored class, which is what Congress thought it was doing, it's instead a statement that puts them in a worse position. The other thing that's interesting about it is that 365h1 only applies to lessees where the lease has commenced. So in other words, the party whose lease has commenced, which is the party that would have a particular claim on Congress's interest, has lesser rights than a lessee whose lease has not yet commenced. If you've not been to the other side about what would happen outside bankruptcy. And as we're told, outside bankruptcy, one party's rejection doesn't terminate the rights of the opposing party. That's right, Your Honor. The non-bankruptcy rule is that the counterparty has the choice. They can either treat the contract as having been a total breach, an anticipatory rejection. Counterparty may treat it as a total breach, or it may seek to enforce the contract. What Congress did in 365 is not. Kagan. And you don't think that there's outside bankruptcy any special rule for trademarks? You agree? No, no. I do think that there are special. I think that trademarks is a special rule. But what I'm trying to explain is that the statute does not operate as they presuppose it does. I just want you to tell me, and I think this is consistent with Justice Ginsburg's question, outside bankruptcy, what would be the rule in this context, in the trademark context? Well, Your Honor, I think our view is that you would have a breach of contract claim, but you would not have an ongoing use of the trademark because precisely because of the nature of the trademark. The nature of the trademark is that it is the trademark owner's reputation. All right. It's a day before bankruptcy. Nobody knows bankruptcy is going to take place. I am the holder of a trademark. I have leased it to you. And you can use it for 10 years, and I assume certain obligations. And I write you a letter. I say, ha, ha, ha, I'm not going to do it. Which is a material breach of the contract. Now you bring a lawsuit the day before. And you say, Judge, you know, I want to keep the leased good, which could be anything. Jewels for a costume company. You know, I don't know about igloos. But nonetheless, you say it could be anything. Okay. What's the law? Can I keep it or not keep it? Well, in our view, you can't because you can't keep it. I already stopped you because it's amazing to me that there is no authority that's more on point than this real estate stuff, which, as you say, is absolutely filled with writings in the statute. So you say in your view. That means you're not certain. Well, I don't think that there's case law that's clear on this. But the notion of the trademark as property, and McCarthy is very clear. I'm not talking about trademarks necessarily. But I mean, they've had property law for 500 years, and people have breached for 500 years. But not trademarks, Your Honor. Okay. Because you couldn't even license a trademark because it was the person, the owner's reputation. You can't think of any analogy or anything that would tell us when you walk in the day before, say, nobody knows about bankruptcy. And you say, Breyer has breached the contract, but I want to keep the property. There's no good case that would help me. Well, if we're talking about something other than trademark, other than trademark, then you're right that the non-bankruptcy law is that the counterparty gets to choose whether to treat that participatory breach as. Okay. But the question is whether you have any authority for the proposition that trademark is different. Whether there's any authority that says, if you're outside bankruptcy and the licensor breaches, is there any authority for the idea that the licensee then has to stop using the mark? I don't have a case to that. No. And then, you see, then the argument really turns down to, which is where I sort of felt after reading the briefs, well, is this continuous obligation to keep the trademark going, which is on me, the breacher? Is that enough? And at that point, I become uncertain. And one of the things cutting against you is that the licensee can keep up the trademark himself. But I don't know if that's enough. So if you found anything that will really help me. No, but the licensee cannot keep up the trademark. That's the problem.  And it's not meaning, you know, subsidiary. It means that it is acting under the control of the trademark owner. Without that control, the trademark no longer serves as the source of identifying for the consumers that it is a genuine article. That's why trademarks are recognized as property. So the licensee can't take any steps when a third party is infringing the trademark, regardless of what the licensor thinks? No. Because the licensee is certainly injured by those infringing activities. It's the licensor who enforces the trademark, because it is the licensor's reputation. And the law imposes on the licensor that responsibility. Well, it may be the licensor's reputation, but it's the licensee's income, right? If the trademark no longer has value, that certainly undermines the value that the licensee saw in the original contract. It may be, Your Honor. But again, this is why McCarthy specifically warns against analogies of trademark to other forms of property, even those that look very similar, like patents. Because trademarks require a unity of ownership. All goodwill must accrue to the trademark owner. All right. But that may be, but there are thousands of McDonald's, I guess, firms that have leased the word McDonald. And if one of, if somehow Super McDonald went bankrupt, couldn't those trustees say, the people in this neighborhood trust me to have real McDonald's? And what I'll do is I will look at every hamburger, and I will make certain that these hamburgers are exactly the same as they were when McDonald was still alive or whatever. Now, he doesn't have a right to do that? Because I got the impression the other reason he does. Your Honor, once the trademark owner ceases to control the mark and enforce the quality, then it becomes an abandoned trademark, and it loses its value. It's not being used. Well, what happens if it's an abandoned trademark?  Well, it's no longer a trademark. Can a person, can, he can. Okay. If he can, and here we're dealing with non-exclusive licenses, why isn't that his problem? Well, Your Honor, again, the rule, the general rule under the 365G is that all claims for breach of that contract have to be brought pre-petition. And that's because a pre-petition claim is pennies on the dollar. A post-petition claim is dollars for dollar. If you allow the counterparty to choose, do I want pre-petition pennies or do I want post-petition dollars, they're always going to choose dollars. And that would frustrate Congress's purpose of ensuring that all claims are brought, resolved, and discharged as part of the bankruptcy. And that's why Congress knew that it had to provide all of the exceptions to the rule. Okay. But that's your, that's your bigger argument, which is not a trademark argument. That's an argument about everything, right? Which is that we should not read G to say that, you know, what G says. Honestly, G says constitutes a breach. That suggests that you just look to the effects of a breach under non-bankruptcy law. Why doesn't G say that? What G says is that it constitutes a breach pre-bankruptcy. So the question is, what are the claims that have to be brought? Are they all claims? Is it a total breach and you have to bring the full value claims? Are there some rights that continue? If Congress thought that some rights would continue. But what you're saying, Mr. Holwood-Driemeier, is that, is that what G tells you is that you can unwind the entire deal. And that's not the effect of a breach outside of bankruptcy in, certainly in the usual context. It can be. But the non-bankruptcy rule gives that choice to the counterparty. And Congress flipped that in 365. It's only in the exceptions that the counterparty has the choice. Kagan. What language are you pointing to in 365G that says anything other than we look to see what happens when you breach? The principal language is that it's a pre-petition breach. And then you have to trace it through. And I realize the Bankruptcy Code is very convoluted. But you have to trace it through 502G1. I'm sure you can. But I just, to explain why it's going to take me some steps. 502G1 says that a claim that arises from rejection must be brought, administered, and is discharged under the general rule as if it had arisen pre-bankruptcy. And then the discharge statute, 1114, also refers to 502G. It says that all claims that arose pre-confirmation are discharged. And then it specifically references the claims specified in 502G. Why? Because what 502G does is make clear that all claims, based on the breach that is the rejection, are deemed pre-petition breach. If Congress thought that some of those claims would be brought for pennies, but other claims could be brought for full dollars, Congress would have told us where that line was. And it didn't. What instead Congress did is it provided the general rule that the, instead of the counterparty getting the choice, treat it as a total breach, terminate it, or sue to enforce, the debtor, the trustee, gets that choice. I'm going to treat it as a total breach, terminate it. And then what the exceptions do in each of them is it gives the counterparty a choice. So now it's the exception. Now, as in non-bankruptcy law, the counterparty gets the choice to treat it as terminated, that's the general rule when Congress enacted N, they said that's the general rule, what would apply apart from the exception, or accept these rights. But the rights that are accepted are a subset of rights that would exist under non-bankruptcy law. And I'll point you to N in particular because N makes clear that the following rights that the patentee, the licensee would not, would have under non-bankruptcy law are not available to it, okay? The right to specific performance, the right to updates in the software or the patent, the right to set off that would be available under non-bankruptcy law, the right to an administrative claim. All of those rights that a party would have under non-bankruptcy law, the counterparty does not have if they elect the rights that Congress has provided them under N. So the idea that Congress adopted this very detailed exception that goes on for pages to provide for patentees, licenses, rather patent licensees, because they were a favored party, and that in the end those are fewer and lesser than the rights of trademark owners, or that patent licensees would have had, had there been no exception at all. Ginsburg. How do you explain that the scholars in this field, the bankruptcy field, disagree with your interpretation, and they say Lubrizol was wrong and Sundin was right? Well, Your Honor, it's not a uniform view. We've pointed to articles that agree with us. The Peter Menno article agrees that upon the rejection of a trademark license, the licensee's right to use is terminated, and instead they have a claim for pre-bankruptcy pennies on the dollar. And, of course, the Wilton article says the same. Mr. Wilton is my co-counsel, so I understand you may discount that. But it is absolutely not true that the views are unanimous in one respect. Among the amici that the other side have are the INTA and other organizations that have gone to Congress many times to ask Congress to adopt an exception, similar to N, for trademark licensees, and Congress has refused to do so. So now they're asking this Court to do what they have failed to obtain from Congress. But note when they went to Congress to ask them to adopt an exception, they understood that it had to be nuanced. It had to balance the parties' respective rights. It had to, for example, provide that you had to continue to conform to trademark standards and, for example, that you have to continue to pay your share of advertising fees. All of these are things that are different because of trademark, because of the duty of control, because of the need to maintain consistency, and Congress could do that in a statute. That's what was proposed. Congress has declined to do so. Breyer. Let me be sure I'm not missing something. Forget bankruptcy. Think of contract law over the course of the centuries. All right? Now, as I started out, A breaches a provision. The ordinary rule is B can keep the property that he's got if he wants. Isn't that the ordinary rule? But then there are lots of not ordinary cases. There should be lots of cases where maybe not like Igloos, but the property is severely injured, disappears, da, da, da, unless the breachor keeps it up. And in those non-bankruptcy cases, what happens? Does he, does he, does he, what happens? Well, Your Honor, previously I said that I was not aware of a case that specifically held that breach by a licensor ends the licensee's right to use the mark. My colleagues have, have reminded me of the Seventh Circuit's decision in Gordon Steen Enterprises v. Quality Care USA, 874 F2nd 431, which holds that it does end the licensee's right to use the mark. Again, I think that's because of the nature of trademark, that it represents the, the owner's reputation, the unitary theory of ownership, which is unique to trademark, and the fact that without that control, there is no related party to, to use the, the, the mark, and therefore it ceases to be effective. So this is a special rule. We're outside of bankruptcy. This is a special rule for trademarks. It's different from the rule that would apply outside bankruptcy for, let's say, leased property. And it's be, the reason why there's a, a different rule is because of the duty of the, the licensor to maintain the quality control. Right. Right. I thought you were saying exactly the opposite, Mr. Hallward-Driemeier. I mean, you said this is consistent with the rule for photocopiers, and your entire brief. In, in bankruptcy. In bankruptcy. That's right. I thought Justice Alito's question had to do with non-bankruptcy. Yeah, no, this is outside bankruptcy. So I, I don't, I don't understand why there would be a special rule for trademark outside bankruptcy that would be, it would be predicated on the licensor's failure to exercise the quality control. And so because, because the licensor doesn't want to do that, the licensor, in, in breach of the contract, gets a more favorable result. It doesn't seem to make any sense. Well, Your Honor, again, I think it's because of the unique nature of the trademark as being only, you can only have a valid license of the trademark if there is that control that's specified by the Lanham Act. It's, and, and so if you don't have that control, then you no longer have a valid I'm sorry, but I don't know why that doesn't control non-bankruptcy rights. Your point would seem to control both, but it doesn't seem to. You're saying bankruptcy gives you more rights. Well, what, what we're saying is that there, we think that with trademarks especially, you can't continue to exercise the trademark license after rejection and that because of the unique character of trademarks. But under our view, it's true generally as well, because if you have a lease of a photocopier, the, the general rule of 365G is that if you, if you reject a lease of a photocopier, that lease now is, is effectively terminated. It's been reduced to a claim for pre-petition damages. And 542A would tell us that the possessor of the, of the photocopier has to return it to the estate unless the, the lease is assumed, which it normally is because it's more beneficial. So the general rule is that these types of ongoing relationships are terminated. They're reduced to a claim for pre-brankruptcy damages, breach of contract damages that are paid pennies on the dollar, and that it's not up to the counterpart  they would rather have dollars for dollar. Because if that were the case, then no counterparty would bring a claim for pre-bankruptcy breach. They would all wait and try to enforce specific performance. Sotomayor, do you have any argument that would limit a ruling in your favor just to trademark law? Because it seems to me that you're asking us to do exactly what the other side wants us to do, to announce a general interpretation of this provision that basically says these types of contracts actually do survive. Well. Unless these have the right to terminate in part and keep other rights alive. Well, Your Honor. I thought when I read your briefs that you had an argument as to why we should limit our ruling to trademark law, but there's no way to do that even under your interpretation. No, no, Your Honor. I think that there is. First of all, all we're asking the court to do is adhere to its ruling in Bill Disco, which said that the effect of rejection is that the contract is no longer an enforceable contract. That's our rule. This Court decided it in Bill Disco. It was in the NLRA context, but the first part of the opinion is all about how, why collective bargaining agreements are subject to 365 A and G, just like any other contract. And so when the Court said. That's somewhat different, because that requires actual affirmative obligations by the employers. Well, Your Honor. We're not arguing the employer has to, the trademark owner has to continue his rights. One of the rights that was deemed one that had to be brought as a pre-petition claim in Bill Disco was a claim based upon the loss of seniority rights. Seniority rights is a form of property right that would be protected, certainly by the Due Process Clause. And yet, that claim for the value of the seniority rights had to be brought as a pre-petition claim. It couldn't just be enforced against the employer anymore. It was reduced to a claim for pre-petition damages. And that's the rule that we're articulating. But even if 365 didn't work the way we say, even if the general rule of 365 G is that non-bankruptcy law provides such that the exceptions become superfluous and actually give the favored parties fewer rights than the general rule would provide, which is, of course, contrary to everything this Court has ever said about exceptions, which they're called exceptions in 365 G, we would still have an argument. Kagan. But so could I understand the sort of nature of the argument? I mean, you have your general argument, and the way that goes is Ms. Spinelli says the effect of rejection is breach, and you say the effect of rejection is rescission. And that's the basic argument where, you know, honestly, Ms. Spinelli has this language that says it constitutes a breach. Pre-petition breach. So but then you say, even if Ms. Spinelli is right on that and we just look to what it means to breach outside non-outside bankruptcy law, then you say we have a special rule for trademarks because trademarks are different outside bankruptcy law, and you have the same rule for the Fifth Circuit case. Is that correct? And the nature of a trademark. And McCarthy explains the rule of unitary ownership that it's a different type of property, that the property is really just the property interest in the owner's reputation, and the fact that the whole notion of licensing, which was a new advent in trademark, was because the licensee is treated as a related party because it is operating under the control. So it is in the nature of the, it is in the nature of trademark that it is subject to that control, and without that control it ceases to exist. But I want to point the Court to the specific language of this trademark license, which I think really brings home the point. This trademark license, and this is a JA-237, says that it grants the mission a non-exclusive, non-transferable, limited license for the duration of the term to use its mark for the limited purposes of performing its obligations, exercising its rights under the agreement, subject to written trademark guidelines of the, of Cool Corps, and the right of Cool Corps to review and approve. In other words, all it was was a contract right. It's not a property right in the license. There can't be because of the rule of unitary ownership. All it was was a contract right to use the trademark subject to Cool Corps' control. And if that control goes away because you can't enforce that, that's one of the, one of the, you know, prospective performance obligations of Cool Corps in a rejected contract. If you can't enforce that, then that control goes away, and with the control goes the license. Thank you very much.  Thank you, Counsel. Three minutes. Ms. Spinelli. Thank you. I have three points that I'll try to make quickly. First, the Gorenstein case that Counsel referred to does not hold that a trademark licensor can unilaterally terminate a license by ceasing to exercise quality control. That was a case in which the licensee defaulted on the agreement for other reasons and then tried to continue using the trademark afterwards. Obviously, that can't be done. So there's no authority for the proposition that general contract principles don't apply to trademark licenses. Second, this is not about whether the debtor can abandon the trademark and get rid of its monitoring obligations. It's about whether the estate can take back the rights in the license and resell them to somebody else and distribute the proceeds among creditors, and it can't. Rejection is not avoidance. There are separate avoidance procedures in the code. Rejection doesn't let the estate claw back interests in the debtor's assets that the debtor conveyed before bankruptcy. Could you answer just one question for me? If you continue using the mark, do the damages that you incur after the filing of the bankruptcy, are they pre-petition debt or post-petition debt? Are you going to get a priority for the damages that accrue after you declare bankruptcy, after bankruptcy has been declared? In this case, Mission has an administrative claim stemming from the wrongful deprivation of its right to use the trademark post-rejection. The estate – it's a claim against the estate that arose post-petition, which is an administrative claim. So you're going to get more rights than N gives other intellectual property. Yes, and let me explain why that's exactly what should happen. Prior to bankruptcy, and this is just like a lease, Justice Breyer, prior to bankruptcy, the debtor conveyed the licensee an interest in its intellectual property. We don't have to call that a property right. It doesn't matter what we call it. But it's a stick in the bundle of sticks, just the same way that a lease grants the tenant a leasehold interest in the landlord's real property. And McCarthy makes this exact analogy. Once the license has been granted, the licensor no longer has that stick. And it's uncontested that the licensor can transfer only what it has. Respondent doesn't dispute that outside bankruptcy, if the licensor sold the intellectual property, the buyer would take subject to the license. And we do have authority for this. It's in the blue brief. And because of that, the licensor's creditors also cannot access the value of the license for their claims against the debtor. Breyer. One quick question. Outside of bankruptcy or in general, you lease. The lessor leases a trademark to the lessee. Lessor doesn't keep it up. Doesn't quality control. Does that stick, which is now in the hands of the lessee, dissolve, disappear? No. Gone? No, it does not. May I respond, Justice Roberts? No, it doesn't. It continues to exist. The ceasing quality control does not immediately dissolve the license. And because outside bankruptcy, the debtor doesn't have the right to transfer the license to a buyer or to its creditors, that is also true in bankruptcy. One of the most fundamental principles of bankruptcy is that the estate can't have any greater rights to property than the debtor itself had at the time of filing. The debtor's IP comes into the bankruptcy estate subject to the license, so the value of the license is not available to creditors. It belongs to the lessee. And nothing about rejection enables the estate to take that license back. Thank you. Thank you, counsel. The case is submitted.